**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| L.O., by her Parents and ) | |
| Next Friends, D.O. and D.O., ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No: 1:11 CV 178** |
| ) | **No. 1:11 CV 187** |
| EAST ALLEN COUNTY SCHOOL CORP., ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM and ORDER</u>

This matter is before the court on what are essentially cross-motions for

summary judgment in the captioned actions consolidated in this proceeding: one filed

by plaintiffs seeking judgment in the suit they filed docketed as 1:11 CV 178, and one

filed by defendant East Allen County School Corporation (hereinafter, "the School")

seeking judgment in its favor for the relief sought in the suit it filed as 1:11 CV 187. The

overall dispute arises from administrative proceedings concerning the student L.O.'s

right to a free appropriate public education ("FAPE") as provided by the Individuals

with Disabilities in Education Act ("IDEA"), 20 U.S.C. § § 1400 et seq. Oversimplifying,

those proceedings those proceedings were initiated when L.O. requested a due process

hearing to determine whether IDEA was violated when she was denied a FAPE by not

having been identified as a child in need of services in a timely fashion and by improper

procedures used to evaluate her. (A.R. 684-96.) Oversimplifying again, that proceeding

ultimately concluded with a decision made by the Independent Hearing Officer

("IHO") that L.O. was entitled to compensatory educational services, and for the School to conduct some additional evaluations.

L.O., through her parents, then brought an action seeking attorneys' fees as a prevailing party pursuant to 20 U.S.C. § 1415(i)(3)(B), and seeks a summary judgment in her favor awarding them. The School filed the separate action consolidated herein pursuant to 20 U.S.C. § 1415(i)(2)(A), appealing certain aspects of the IHO's decision, and it too seeks a summary judgment in its favor. To be a prevailing party entitled to attorneys' fees, L.O. must show that the IHO's decision caused a material alteration of her educational relationship with the School, *Bingham v. New Berlin School Dist.*, 550 F.3d 601, 603 (7th Cir. 2008), and the size of any award depends on the degree of success obtained. *See Farrar v. Hobby*, 506 U.S. 103 (1992); *Giosta v. Midland School Dist. 7*, 542 Fed. Appx. 523, 524 (7th Cir. 2013).

Conversely, as the party challenging the administrative outcome, the School has the burden of persuasion in that regard. *Marshall Joint School Dist. No. 2 v. C.D.*, 616 F.3d 632, 636 (7th Cir. 2010). As to issues of law, this court's review is *de novo* and the IHO is owed no deference. *Alex R. v. Forrestville Valley Community Unit School Dist. No. 221*, 375 F.3d 603, 611 (7th Cir. 2004). On factual issues, however, the court must accord the IHO's findings due deference. *Id.* at 612. Where, as here, the case is to be decided on the basis of the administrative record from below without the submission of new evidence, "due" deference is substantial deference, and the IHO's findings and order based

thereon can be set aside only if this court is strongly convinced the order was erroneous.

*Id.*

*Background/Findings of Fact, Conclusions of Law, Orders Below*

Ordinarily the court would provide a summary of the dispute between the parties as a background to the analysis that follows. In this case, however, the most efficient way to do that is to summarize the relevant factual findings made by the IHO, his conclusions of law, and his orders based thereon. Doing so not only explains L.O.'s circumstances which caused her parents to invoke due process rights pursuant to IDEA below, but also provides the necessary details for the analysis that follows. It bears repeating, however, that this is a summary, that is, a condensed version of the IHO's 41-page (over 41 pages, considering a later amendment) hearing decision. That means certain details have been simplified, generalized or omitted.

*Hearing Officer's Factual Findings*[1]

At the time of the hearing, March 2011, L.O. was in the ninth grade, was fifteen years old, (633; 4[2]), and had been found eligible for special education services.[3] (633; 5.)

_____

[1] The IHO's factual findings consist of 54 numbered paragraphs found at pages 632-650 of the administrative record. Only those findings pertinent to the analysis herein are summarized.

[2] Throughout this order, the court will use an abbreviated citation format for the administrative record consisting of page number only, or page number followed by a semi-colon and a second numeral, referencing a numbered paragraph on that page. In some cases, however, for clarity there will be a cite to "A.R. followed by a page number.

[3] At the time of the hearing, the parents had not consented to implementation of the School-proposed IEP, but the School had implemented it, nonetheless, at the

When L.O. was in the fourth grade she contracted a streptococcus bacterial infection that resulted in her developing a medical disorder called Pediatric Autoimmune Neuropsychiatric Disorders Associated with Streptococcal Infections, commonly abbreviated as PANDAS.[4] (633; 7.) Her resulting symptoms worsened over time, but after beginning to receive care at age 14[5] from a pediatric specializing in treatment of PANDAS, L.O. made progress with her symptoms. (633-34; 7.) Because of the problems associated with PANDAS, L.O. has psychiatric diagnoses of Obsessive-Compulsive disorder ("OCD"), Tourette's Disorder, and Attention Deficit Hyperactivity Disorder. (634; 8.)

During elementary school L.O. earned all A and B grades, except for one C in the fourth grade. (634-35; 10.) In the seventh grade her grades began to decline, with more C grades, although in the third trimester she received three B grades and one A-minus.

_____

beginning of the 2010-2011 academic year. (A.R. 666-67 and citations therein.)

[4] The website of the National Institute of Mental Health states that PANDAS is a "term is used to describe a subset of children who have Obsessive Compulsive Disorder (OCD) and/or tic disorders such as Tourette Syndrome, and in whom symptoms worsen following strep infections such as 'Strep throat' and Scarlet Fever. The children usually have dramatic, 'overnight' onset of symptoms, including motor or vocal tics, obsessions, and/or compulsions. In addition to these symptoms, children may also become moody, irritable or show concerns about separating from parents or loved ones. This abrupt onset is generally preceeded [sic] by a Strep throat infection." (http://www.nimh.nih.gov/health/publications/pandas/index.shtml, accessed September 28, 2014.) The causation mechanism is presently unknown. (*Id.*)

[5] Although the PANDAS may have resulted from an infection L.O. had in fourth grade, it appears that this is when she was first diagnosed by a pediatric specialist, in January 2010. (A..R. at 909.)

(635; 11.)  Third trimester grades in the eight grade were A-plus, A, two B grades, a C+ and a C; in the ninth grade they were two A-pluses, one A, three Bs, one C-plus, one C and one C-minus, and one D-plus. (635; 12, 13.)

With the exception of math in the fourth grade, in grades 3 - 6 L.O. passed Indiana Statewide Testing for Educational Progress Plus ("ISTEP+"), which is a standardized group achievement test in English, math and science. (635; 14.) In the seventh grade she did not pass. (*Id*.)  In the fall semester of eight grade, she did not pass English or math (science was not administered). (*Id*.) In spring semester, she passed English, did not pass math (science was not administered). (636; 14.) In ninth grade ISTEP+ was administered for biology, which L.O. failed, and algebra, which she passed. (635; 15.) However, L.O. also took NWEA[6] standardized tests which indicated that L.O. was equal to norms of typical students. (636; 16.)

In September, 2007, L.O.'s parents requested an Individual Educational Evaluation ("IEE'") because they thought she was spending too much time on her homework and preparation for tests, trying for perfection and getting "stressed out." (636; 17.) The evaluation consisted of measures of cognitive ability, achievement, and assessments of adaptive behavior based on ratings by teachers and interviews with the parents and LO herself. (636; 18.) In short, test scores for cognition and achievement showed her to be average in all areas. (636-37; 18, 19.)  On behavior assessment, her

---

[6] This acronym stands for the Northwest Evaluation Association, a not-for-profit organization that among other activities provides standardized tests to evaluate and measure academic progress. (https://www.nwea.org, accessed September 28, 2014.)

teachers rated her average in all areas; this differed markedly from her parents assessment, who reported significant problems in the areas of hyperactivity, anxiety, depression, atypicality and withdrawal, and at-risk in somatization[7] and leadership skills. (637; 20.) L.O. reported herself as having a significant attention problem, and at-risk for depression, atypicality and social stress. (*Id*.) At the case conference convened almost immediately thereafter, school personnel unanimously agreed that L.O. was not in need of special education services based on her ability, achievement and behavior being in the average range at school. (637-38; 21.)

The School also implements "General Education Intervention Plans" ("GEIP") to assist students who are having difficulties but who do not qualify for special education. (638; 22.) Although a GEIP is not required before a student is found to be in need of special education services, the school considers implementation of a GEIP and its associated "Action Plan" to be a form of response to a need for intervention,[8] although the two programs are not the same. (638; 22.) Prior to the 2007 case conference, the School had implemented a GEIP for L.O. starting in January, 2006. (638; 23.) The record of the GEIP for L.O. shows that the School recognized her OCD, that she was spending several hours a night on homework, that she did not do well in timed situations, that there were concerns in math, reading, task attention and short attention span. (*Id*.) The GEIP included accommodations of preferential seating, additional time to complete

---

[7] A term for recurrent multiple medical problems with no discernible cause.

[8] IDEA requires schools to identify and assess students who need intervention.

tasks and take tests, providing a structured daily routine, assignments given both orally and visually, reduced quantity of material in math, and increased contact between school personnel and the parents. (639; 23.) L.O.'s parents agreed to implementation of this GEIP. (*Id*.) Additional meetings and discussions concerning the GEIP were held on at least 13 occasions during 2006-2010. (639; 24.) In general, L.O.'s teachers felt that she was doing well. (*Id*.)

In 2009 L.O. received tutoring from a private learning center and its staff conducted additional assessments. (639; 25.) She scored average in nine areas (including vocabulary and math reasoning/computation), below average in oral reading rate, and oral reading accuracy, fluency, comprehension. (639-40; 25.)

On March 23, 2010, L.O.'s parents requested the school to complete an educational evaluation to consider L.O.'s eligibility for special education in the areas of Specific Learning Disability and Other Health Impairment. (640; 26.) The evaluation was completed in April/May 2010, and results were similar to the 2007 evaluation, with all scores showing L.O. to be in the average range, except for a significant decrease in "processing speed" on the Wechsler Intelligence Scale for Children. (640; 27.) The school psychologist explained that L.O. works at a slower pace on the items tested for processing speed, which lowered her score. (641; 27). Achievement testing, compared to 2007, showed a decline in math fluency and writing fluency. (641; 28.) Cognitive ability testing showed average performance in all areas except for one subtest measuring processing speed, which was below average. (642; 29.) Assessment of adaptive behavior

by L.O.'s teachers placed her in the high average range; her parents rated her average. (642; 30.)

A ratings scale to measure behaviors associated with ADHD was completed by teachers, parents and L.O. Two of the three teachers rated L.O. average in all areas; one placed her at risk in several areas. (642; 31.) Parents rated L.O. significant in all areas, and L.O. rated herself significant for inattention and at-risk for hyperactivity/impulsivity and learning problems. (*Id*.) The three teachers also completed a behavior rating scale and found L.O. average in all areas except one teacher rated her at-risk for somatization, adaptability, leadership, and resiliency. (642; 32.) Her parents rated her as significant or at-risk in virtually all areas. (*Id*.)

Following completion of the evaluation, a case conference was conducted in late May and early June, 2010. (643; 33.) The school proposed that L.O. was eligible for special education services implemented in an Individualized Education Plan ("IEP") as a student classified with the disability of "Other Health Impairment (511 IAC 7-41-10)," and that the steps implemented in her GEIP could continue to address her educational needs. (*Id*.) The IEP included goals to address Study Skills, Organization, and Social-Emotional needs. (643; 34.) A single objective/benchmark was included that L.O. would use study guides, new strategies, and accommodations within her IEP to compensate for processing speed 80% of the time. (*Id*.) Methods were included for evaluating progress. (*Id*.) An organization goal was included that included an objective/benchmark that L.O. would utilize backwards planning to develop a timeline

and complete long-term projects by the timeline's deadline. (643-44; 34.) A social/emotional goal was set to focus on learning skills to recognize and cope with stressors. (*Id*.)

The IEP included a number of accommodations including, for algebra, extended test-taking time, use of her own calculator, testing in a small group setting; for language arts, extended test-taking time, testing in a small group setting, and tests read aloud by a test administrator; for biology, extended test-taking time and testing in a small group setting. (644; 35.) There were a number of other accommodations, including time and a half for all test; the opportunity to correct answers if the teacher felt reasons other than lack of preparation impacted the test; teachers seeking out the student to check her understanding of new concepts, and sending a set of textbooks home. (*Id*.) The IEP also included academic support by special education staff for 70 minutes per day; 30 minutes per week of consultation; and 70 minutes per day of direct instruction/study skills. (644; 36.) The IEP did not include a health plan, although L.O.'s mother had testified that accommodations needed to be made for use of hand sanitizers because L.O. has a compromised immune system. (645; 37.)

L.O. testified that her OCD, Tourette's and anxiety were improving, and her parents agreed. (645; 40.) Her parents did not consent to implementation of the IEP at the conclusion of the conference because they wanted to discuss with L.O. "her feeling about being labeled for special education services." (645; 41.) On June 3, 2010, the parents presented a written request for an independent educational examination

("IEE"), to include additional evaluations including auditory processing skills and language skills. (645; 42, 646; 44.) On June 17, 2010, the School's Director of Special Education ("DSE") responded that the school wanted to exercise its option to conduct the IEE, and that if the parents disagreed with the result, they could request one at public expense. (646; 42.) On June 22, 2010, the parents responded that they did not want to wait a long period of time for the School to conduct the central processing disorder evaluation. (646; 43.) The DSE responded that the School was willing to conduct the evaluation and that an IEE would be premature. (*Id*.) The central auditory processing evaluation was conducted by an independent evaluator at the School's expense following an order by the IHO. (646; 44.) The evaluator concluded that L.O.'s auditory perceptual skills set is "within a generally acceptable range for a student of her age. In my opinion this is not an area of disability." (646-47; 44.)

L.O. takes medicine at school as needed to treat tic symptoms associated with Tourette's, has permission to go to the school nurse's office to take it, and has done so on several occasions. (648; 46.) The nurse has never observed any tics, and does not believe that L.O. requires a medical plan. (*Id*.) Testimony of L.O.'s teachers was that they did not observe tics or symptoms of OCD. (648; 47.) Their testimony was that she was not disruptive, had friends, did not show high levels of disorganization, worked hard on assignments, and seemed to enjoy school. (*Id*.) They uniformly described her as typical of students her age. (*Id*.)

On one occasion when L.O. was the last student to finish a test, a boy annoyed by the delay made derogatory comments to her and called her a profane name. (646; 48.) The substitute teacher in charge of the class did not appropriately address the incident. (*Id*.) After L.O. told her parents, they contacted the School, which then disciplined the boy and determined the substitute teacher would not be hired again. (*Id*.) The principal apologized to the parents in an e-mail message. (*Id*.) The parents considered the incident to be bullying and harassment, and they testified that L.O. became afraid of being harmed in the future. (646-47; 48.) A similar incident occurred in April 2009, and L.O. responded to the boy (who had told her she took so long that he "felt like slitting" her throat) by calling him an expletive, which ended the conversation. (647; 49.) The principal responded, copying the dean of students on the message, telling the parents that L.O. should report any similar incidents to an adult. (*Id*.) There is no evidence whether the boy who made the comment was disciplined. (*Id*.)

There was no evidence that L.O. needs any assistive technology to help her meet educational needs, although there was some discussion of providing her with a laptop computer to take notes in class. (650; 53.) L.O. testified, however, that she did not want one because it would make her stand out in class, and there was no evidence establishing that a computer was necessary. (*Id*.)

The record of GEIP meetings shows that the School staff know of L.O.'s condition and history, and how PANDAS-related issues can interfere with educational performance. (650; 54.) Although the school counselor has some training in Tourette's,

OCD, PANDAS and ADHD, the classroom teachers had no specific training and there was no evidence that special education teachers did, either. (650; 54.)

*Hearing Officer's Conclusions of Law*

By the time of the due-process hearing, through pre-hearing procedures 25 issues were presented for resolution, all of which were proposed by L.O. Based on the factual findings above (and others not reiterated above), the IHO entered a legal conclusion on each. Using the IHO's numbering scheme, the resolution of each is paraphrased as succinctly as is possible,[9] and in a manner intended to explain what the issue was without restating it. In some cases, however, the court does quote the IHO's conclusion for clarity.

Issue 1. Prior to the spring 2010 evaluation, the School did have sufficient information to conclude that L.O. did not have a disability. (651; 3.)

Issue 2. The School's spring 201 evaluation was appropriate and met the requirements of Indiana law implementing IDEA. (652; 4.)

Issue 3. In the spring 2010 evaluation, the School evaluated L.O. in all appropriate areas of suspected disability and considered her psychiatric conditions. (653; 5.)

Issue 4. The evidence does not establish that L.O. has a Specific Learning disability that is not accounted for by her assessment as Other Health Impairment.

---

[9] Due to brevity, some nuance is undoubtedly lost. The findings in full are at pages 651-61 of the administrative record.

Because she has been found eligible for special education due to that classification, her IEP must address her deficits in processing speed and reading and writing fluency. (653-54; 6.)

Issue 5. The IEP the School proposed in spring 2010 provides meaningful educational benefit and is appropriate. (655; 7.)

Issue 6. The IEP appropriately addresses L.O.'s processing skill deficits. (655; 8.)

Issue 7. "It is not clear from the evidence and testimony when the problems became sufficiently severe that [they] would have indicated that she was eligible for special education services. Therefore, the Student has not met the burden of persuasion to show whether she should have been found eligible for special education earlier than 2010." (656; 9.)

Issue 8. The goals and objectives of the IEP are appropriate to meet L.O.'s educational needs, but are not as measurable and objective as is necessary to evaluate her progress. (656; 10.)

Issue 9. Due to administrative error, some educational records requested by the parents were not provided in a timely manner; however, this failing did not lead to the denial of a "FAPE" (Free Appropriate Public Education) for L.O. (656; 11.)

Issue 10. The School responded appropriately to the Parents' request for an IEE, and completed it within the legally-required time. (657; 12.)

Issue 11. The School provided appropriate prior written notice concerning its educational evaluations, including the parents' IEE request. (657; 13.)

Issue 12. L.O. did not meet her burden or persuasion to establish that the School has not provided "highly qualified teachers" as required by provisions of Indiana law to implement her IEP. (658; 14.)

Issue 13. L.O. did not establish that the School inappropriately considered budgetary and/or staffing issues in determining whether to provide her special education services. (658; 15.)

Issue 14. The School gave appropriate consideration to the recommendations of outside evaluators. (659; 16.)

Issue 15. No evidence was presented that L.O. needs a health plan. (659; 17.)

Issue 16.  Although the student does not need a health plan, some accommodations may be necessary for L.O. to use hand sanitizers. (659; 18.)

Issue 17. L.O. does not require School-provided social skills training. L.O. might need counseling to address school-related issues regarding time management, task completion and organization, and so the School should conduct an evaluation to see if she needs regular contact with the school counselor or psychologist. (660; 19.)

Issue 18. L.O. did not meet her burden of persuasion to show that the School pre-determined her eligibility prior to the spring 2010 case conference. (660; 20.)

Issue 19 — prior to amendment:[10] "Compensatory educational services may be provided to a Student who should have received them, but did not due to actions of a school. . . .  In this matter, the evidence and testimony do not establish specifically when

_____

[10] The amendment and the reasons for it will be discussed *infra*.

the Student should have been determined to be eligible for special education services

. . . . However, the Student is entitled to some compensatory services that will be

described in the Orders." (661; 21.)

Issue 19 — after amendment: "The evidence and testimony established that the

Student had been struggling and needed special education services . . . [.] The School

did not find her eligible for special education services for the 2009-2010 school year,

when it was evident that she needed services, which is related to "child find"

responsibilities of a school. [Citation omitted.] Compensatory educational services may

be provided to a Student who should have received them, but did not due to actions of

a school. . . . Therefore, the Student is entitled to compensatory services for the

academic year of 2009-2010 equivalent to those provided in the IEP that was

implemented during the 2010-2011 school year." (A.R. at 700.)[11]

Issue 20. L.O. was teased and harassed on two occasions due to her disability.

(661; 22.)

Issue 21. There is no evidence that these two instances of harassment resulted in

the denial of a FAPE, a Free Appropriate Public Education. (662; 23.)

---

[11] The issue of compensatory education discussed herein is not moot because
L.O. is not yet 21 years old, and compensatory educational services can be ordered
under IDEA until that age; in addition, in the full exercise of granting equitable
remedies, the court can order compensatory education even after that age. *Bd. of Educ. of
Oak Park & River Forest High School Dist. 200 v. Illinois State Bd. of Educ.*, 79 F.3d 654, 656
(7th Cir. 1996).

Issue 22. L.O. did not meet the burden of persuasion that she requires assistive technology. (662; 24.)

Issue 23. L.O. requires accommodations and modifications to meet her needs. (662; 25.)

Issue 24. Although the School did not, prior to spring 2010, implement the accommodations and modifications on the GEIP consistently, because an IEP was not in place, it did not violate provisions of Indiana law implementing IDEA. (662; 26.)

Issue 25. The parents are entitled to any reimbursement for outside evaluations, services, or their mileage. (663; 27.)

The court points out that only three of the 25 issues above were, arguably, resolved in L.O.'s favor, those being Issues 8, 17 and 19.

*Hearing Officer's Orders*

Prior to an amendment, which will be discussed further below, the IHO entered seven orders. The court summarizes them briefly.

1. The School was to implement the June, 3, 2010 IEP, and the special education teacher of record was to ensure that general education teachers complied fully with all accommodations and modifications necessary for L.O. as provided therein. (663; 1.)

2. The School was to conduct an assessment to see if L.O. needed counseling services from the counselor or school psychologist. (663-64, 2.)

3. The school was ordered to conduct an assistive technology evaluation. (664; 3.)

4. (Prior to amendment) The School was to provide compensatory educational services equal to those in the proposed IEP, for a period of one year. Those services could be provided over the 2011-2012 school year. (664; 4.) After amendment, as is discussed further, the phrase "proposed IEP" was changed to "the IEP that was implemented during the 2010-2011 school year." (700.)

5. The School was ordered to take reasonable steps to protect L.O. from bullying and harassment, and to take appropriate action if such incidents did occur. (664; 5.)

6. The parties were ordered to convene a case conference to "address the degree to which the goals and objectives are measurable and include a more precise description of how they are to be measured and evaluated." (664; 6.)

7. The School was ordered to perform an evaluation to determine if hand sanitizers were necessary for L.O.'s health. (665; 7.)

The IHO's written decision was rendered on April 24, 2011. The School then requested that the IHO clarify and modify his order. (666-67.) In essence, the School observed that Order 1, to implement the June 2010 IEP, was not necessary, because the IEP had been implemented in the fall of 2010 at the beginning of the academic year, and so had already been in place for a school year when the IHO rendered his decision. (666.) Thus, the School questioned why a year of compensatory educational services

was needed (when a year had already been provided), and requested the IHO to modify Order 4, directing the School to provide compensatory services.[12] (A.R. at 667.)

In response to this request, counsel for plaintiffs asserted that the IHO must have ordered a year of compensatory education because he "believed that the [School] district knew or should have known that this was a child with a disability a full year prior to the district actually finding her eligible." (A.R. at 680.) L.O.'s counsel proposed that instead of modifying (by removing) the order for a year of compensatory services, the IHO should add a finding or legal conclusion that he had ordered a year of compensatory services because "due to the district's failure to timely conduct its child find[13] activities by failing to timely evaluate and failing to timely identify her as a child who was suspected of having a disability that would make her eligible for an IEP."

In reply, the School asserted that since neither party disputed that the IEP was implemented for the 2010-2011 school year, the only issue was "is Order #4 satisfied?" (697.) On May 27, 2011, the IHO issued his order of clarification. In essence, he adopted

---

[12] As additional support or its request, the School noted that by denying reimbursement for private tutoring (in Issue 25) the IHO effectively denied compensatory education. (A.R. at 667.)

[13] "Child find" is the term used for the obligation imposed by IDEA that: "All children with disabilities residing in the State, . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services." 20 U.S.C. § 1412(a)(3)(A).

the suggestion made by plaintiff's counsel and amended conclusion of law on Issue 19,

now labeling it as a finding of fact. That conclusion had originally stated that "the

evidence and testimony do not establish specifically when the Student should have

been determined to be eligible for special education services." (661; 21.) The IHO

amended it to read:

> The evidence and testimony established that the Student had
> been struggling and needed special education services . . . [.]
> The School did not find her eligible for special education
> services for the 2009-2010 school year, when it was evident
> that she needed services, which is related to "child find"
> responsibilities of a school. [Citation omitted.] . . .
> Therefore, the Student is entitled to compensatory services
> for the academic year of 2009-2010 equivalent to those
> provided in the IEP that was implemented during the 2010-
> 2011 school year.

(700.) In other words, the IHO reversed his position as to what the evidence showed

with regard to when L.O. should have been found eligible for special education, but at

the same time did not make a finding that the School had in fact violated its child find

obligations. Other than this amendment and the slight change in wording to Order #4,

the IHO left all other findings of fact, conclusions of law and orders unchanged. (A.R. at

700.)

<em>The School's Motion for Summary Judgment</em>

The court takes up the School's motion first, because if the School is correct that

findings, conclusions and/or orders made by the IHO should be set aside, that will

impact whether L.O. was a prevailing party: L.O.'s motion for summary judgment is

based on her argument that those orders show she is the prevailing party. The School, however, contends that the IHO's Conclusion of Law on Issue 19, as amended, is erroneous because unsupported by substantial evidence presented at the hearing and contrary to law, as are all of the orders issued by the IHO. The School requests the court to strike those orders.

Three general principles serve to preface the discussion which follows. First of course, applying the proper deferential standard discussed at the outset of this opinion, there is the issue whether the evidence supports the administrative decision made. Second, the hearing officer must decide the case based on the determination whether the student has been deprived of a FAPE, 20 U.S.C. § 1415(f)(3)(E); in other words, where there is no violation of law, there is no authority to order a remedy. *See B.B. v. Perry Tp. School Corp.*, 2008 WL 2745094 at * 16 ( S.D. Ind. 2008 ("Because the IHO found no violation of federal or state law related to setting objective, measurable goals, he did not have the authority to order a remedy relating to devising goals in the IEP.") Third, in the absence of a violation, an order which requires a school to do only what the law already requires does not materially alter the relationship between the parties. *See P.D. v. Mt. Vernon Community School Corp.*, 2008 WL 1701877 at * 5 (S.D. Ind. 2008).

The School's arguments discussed below are based largely on the fact that the IHO did not find any violation, either substantive or procedural, of the IDEA or the Indiana laws implementing it resulting in the denial of a free and appropriate public education to L.O.; thus it was contrary to law for the IHO to order remedies and those

20

"remedies" only ordered the School to do what it was already required to do. The court considers the parties' arguments on each of the seven orders made by the IHO.[14]

*Order #1*

This order directed the school to implement the June, 3, 2010 proposed IEP, and for the special education teacher of record to ensure that all general education teachers complied fully with all accommodations and modifications necessary for L.O. provided therein. (663; 1.) First, the evidence at the hearing showed that the School had already implemented the IEP (A.R. 668-69) making that portion of the order unnecessary and contrary to the evidence. Second, although the IHO found that while L.O.'s GEIP was in place the accommodations and modifications in it had not been consistently applied by general education teachers, his conclusion of law on Issue 24 was that this did not result in a violation of FAPE because L.O. had not yet been determined eligible for services and an IEP established. (A.R. at 662.) Moreover, Indiana's implementation of IDEA requires the teacher of record to ensure that all other teachers are informed of the specific accommodations and modifications mandated in the IEP, and to monitor implementation. 511 Ind. Admin. Code § 7-42-8.

_____

[14] Another argument made by the School is that L.O.'s diagnosis of PANDAS was never revealed until the due process hearing, and that failure to make an earlier disclosure cannot be held against the School and used as a justification to support a finding that it should have found her eligible for services earlier. The court rejects this argument because there is evidence in the record showing that the School was made aware earlier, *e.g.*, Donna Moran, the school psychologist, testified it was mentioned by the parents at a GEIP conference. (A.R. at 4047.)

L.O.'s response to the School's motion lumps her argument on the first order in with her argument on the sixth order (regarding measurable goals), saying nothing specific to address the School's argument that the order was unnecessary because redundant and not supported by any evidence of a FAPE violation. Because the IEP had already been implemented, and because the order for the School to ensure that all teachers complied with the modifications and accommodations did nothing more than direct the School to follow a law it had not been found to violate, the order is unsupported and does not materially alter the parties' legal relationship. It will be struck.

*Order #2, Order #3*

The court addresses these two orders together, because L.O. groups her response to the School's arguments together. Order #2 directed the School to conduct an assessment to see if L.O. needed counseling services from the counselor or school psychologist. (A.R. at 663-64.) Order #3 directed the school to conduct an evaluation to determine whether L.O. needs assistive technology. L.O. argues that both of these orders are supported by *W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995), which holds that the IHO does not need proof that these evaluations are necessary, just evidence sufficient to raise a suspicion that services might be needed. To the extent that the case states this proposition, it does so in the context of triggering an evaluation to see whether a child should be evaluated for a disability and provision of an IEP, not, as

here, where extra evaluations are ordered as adjuncts to an IEP already found to be appropriate.

The School argues that Order #2, for a counseling assessment, is not supported by the evidence because the IHO found that L.O. did not need counseling to deal with interpersonal issues or management of symptoms at school, but instead to provide assistance with learning to manage time, task completion, assignments and organization, which—as the IHO recognized—were all matters already addressed in the IEP. (A.R. at 660.) Not only does this make the counseling redundant, the IHO's order was based on the evidentiary finding that the "school counselor testified that the Student may need counseling to address school-related issues." (*Id.*) This is contrary to the actual evidence. When the IHO asked the school counselor Cary Cogdill if he saw a need for counseling for school-related issues, he answered "no." (A.R. at 5294.)

As to Order #3, for an assessment for assistive technology, in factual finding 53 the IHO stated that there is no evidence that L.O. needs assistive technology, and although use of a laptop computer was discussed, the evidence did not show it to be necessary. (A.R. at 650.) The IHO reiterated that finding in his conclusion of law on Issue 22, adding that L.O. had not met her burden of persuasion that she requires assistive technology. (A.R. at 662.)

The court is convinced that the IHO erred. As to counseling, his finding of fact in support of the order is contradicted by the record. As to assistive technology, his order is contradicted by his finding that there is no evidence that it is necessary for L.O.'s

needs, and that she did not meet her burden of persuasion on the issue. Moreover, the order is contrary to evidence in the record, the testimony of School psychologist Donna Moran that there was no need for an assistive technology evaluation. (A.R. at 4076.) Thus, Order #2 and Order #3 are struck.

*Order #4*

Order #4, requiring the School to provide a year of compensatory educational services, is at the heart of this case. L.O. devotes the great majority of both her own motion for summary judgment and her response to the School's motion to arguing that the order is warranted because ample evidence supports the IHO's revised finding/conclusion of law on Issue 19 that the School should have found L.O. eligible for special education services for the 2009-2010 school year. L.O. argues:

> [T]he school's own witness admitted, "[L.O.'s] processing speed dropped" from 2007 to 2009, and the Student scored at the .5 percentile in a processing speed test. (R., pp. 3890, 3928). The Student also possessed an academic fluency score that "raised a red flag" for the school psychologist. (R., pg. 3933). Thus, the abundant evidence and testimony indicated that sometime between 2007 and 2009, L.O. became eligible for special services and programs because of a disability (OHI). (R., pg. 700). The IHO obviously felt the School had breached its child-find duties, or he would not have referenced them in his Conclusion of Law. (R., pg. 700)

(DE #36 at 15-16.)

The problem with this argument is that there is also abundant evidence in the record to the contrary. For example, although School psychologist Donna Moran did testify that L.O.'s academic fluency score would raise a red flag, she also testified that

24

considering L.O.'s grades and other standardized achievement tests,[15] her "ability to learn overall was in the average range," and "the fact that she was passing her classes . . . and her scores in this evaluation [the spring 2010] were in the average range, this did not indicate a need for special education because . . . her condition wasn't significantly impacting her ability to learn," (A.R. at 3337); that based on feedback from teachers, she never got the feeling that L.O. was "struggling tremendously in any of her classes," (A.R. at 3358); that from her evaluation and testing it "did not appear she [L.O.] had a learning disability or was eligible for emotional disability because she was performing adequately," (A.R. at 3453); and that looking at "the whole, total picture" L.O.'s health conditions "weren't significantly impacting her ability to perform." (A.R. at 3462.)[16]

In other words, this court could summarize reams of evidence both supporting, and contradicting, the IHO's determination. Because this court should give substantial deference to all of the IHO's factual findings based on evidence of record, the question becomes whether his amended finding/conclusion on Issue 19 that "evidence and testimony established that the Student had been struggling and needed special

---

[15] L.O. also argues that failing scores on the ISTEP during the three years prior to 2010 show that she qualified for services. Moran testified, however, that L.O.'s ISTEP failures were by a small margin, for example, on the math portion in eight grade by only two points (A.R. at 3359).

[16] Despite this assessment from Moran, the case conference committee decided to classify L.O. as eligible for services under the Other Health Impaired designation. Moran believed the parents' input, for example, regarding how long it was taking L.O. to do homework and associated strong belief that L.O. was entitled to special education "played heavily" in that decision. (A.R. at 3453-54.)

education services . . . [but] [t]he School did not find her eligible for special education services for the 2009-2010 school year, when it was evident that she needed services, which is related to 'child find' responsibilities of a school," (A.R. at 700), is consistent with and supported by the IHO's findings as a whole.

Looking at the question this way, the court is firmly convinced that the IHO erred. Altthough he referenced "child find," he did not find that the School had violated its child find responsibilities, consistent with the fact that there he made no finding anywhere that the School failed to provide FAPE, or violated any provisions of IDEA or Indiana's implementation thereof. Moreover, the finding that it was "evident" that L.O. needed special education services for the 2009-2010 school years is flatly contradicted by, and inconsistent with, the IHO's other findings and conclusions, most notably that prior to the spring, 2010, evaluation, the School *did* have sufficient information to conclude that L.O. did not have a disability (A.R. at 651); and that L.O. failed to meet "the burden of persuasion to show whether she should have been found eligible for special education earlier than 2010." (A.R. at 656). This internal contradiction and inconsistency convinces the court that the IHO's amendment of his finding on Issue 19 was an attempt to provide a rationale for an unsupportable conclusion and order that L.O. should be provided compensatory education services. Therefore, Order #4 will be struck.

*Order #5*

In this order the School was ordered to take reasonable steps to protect L.O. from bullying and harassment, and to take appropriate action if such incidents did occur. L.O. asserts that the propriety of this Order "can be addressed summarily." (DE #36 at 11.) L.O. contends that because of the two incidents where she was harassed, the substitute teacher's failure to address the first incident appropriately, and the fear these incidents caused her regarding the future (because her IEP requires her to be given extra time to take test, which is what spurred the two incidents), the order was justified. However, the IHO concluded that the School could not have anticipated or prevented these two incidents; that the School took appropriate corrective action; and that the incidents did not cause L.O. to be denied a FAPE. (A.R. at 661-62.) Thus, his order is not based on any violation of law, and it orders the School to comply with Indiana law requiring adoption of an anti-bullying policy, Ind. Code § 20-33-8-13.5, which the school has done. (A.R. at 662.) Thus, the order is not supported by the evidence and is unwarranted, and is struck.

*Order #6*

This order directed the parties to convene a case conference to "address the degree to which the goals and objectives are measurable and include a more precise description of how they are to be measured and evaluated." (A.R. at 664.) L.O. asserts this order is appropriate given IDEA's requirements that IEPs include adequate terms for measuring and evaluating progress, citing as support *Evans v. Board of Educ. of*

*Rhinebeck Cent. School Dist.*, 930 F. Supp. 83 (S.D.N.Y. 1996), a case in which the court held that an IEP containing only "only broad, generic objectives and vague, subjective methods for monitoring" progress violated the law. *Id*. at 97.

In the present case, however, the IHO found as to hearing issue 8 that "[t]he goals and objectives of the IEP are appropriate to meet L.O.'s educational needs," (A.R. at 656), and unlike *Evans*, L.O. has not moved for this court to vacate that finding, likely because the IHO then added that the goals and objectives "are not as measurable and objective as is necessary to evaluate her progress." (*Id*.) The IHO made no finding that this shortcoming violated the law, however, and his order only required the parties to "address the degree" to which the goals and objectives are measurable. In this circumstance:

> Because the IHO found no violation of federal or state law related to setting objective, measurable goals, he did not have the authority to order a remedy relating to devising goals in the IEP. Order 3 simply restated the obligations the school district has under federal and state law to devise measurable annual goals. Such a restatement might have been appropriate if the school district had been violating these requirements, but the hearing officer found no such violations.

*B.B.*, 2008 WL 2745094 at * 16. The IHO's order to convene a case conference to address measurable goals is not supported by a finding that the IEP violated the law, and is struck.

*Order #7*

This Order requires the School to perform an evaluation to determine if hand sanitizers are necessary for L.O.'s health. (A.R. at 665.) Like Order #5, L.O. asserts that the propriety of this Order "can be addressed summarily." (DE #36 at 11.) L.O. asserts the order is supportable solely by the uncontradicted testimony of her parents that because of her compromised immune system, she needs access to hand sanitizers at frequent times. (*See, e.g.*, A.R. at 4287; 4561-62.) There is no indication that L.O.'s parents are qualified to give what is essentially an expert medical opinion, however, and the order is contradicted by the IHO's findings and conclusions regarding hearing issues 15 and 16 that there is no evidence that L.O. needs a health plan, and that she does not need one. (A.R. at 659.) Finally, as the School argues, the IHO made no finding that provision of hand sanitizers is an accommodation needed in the IEP as being related to the provision of special education services,[17] leaving the order in want of any legal justification. The order to perform an evaluation to determine need for hand sanitizers is struck.

*L.O.'s Motion for Summary Judgment*

Because the School's motion for summary judgment is being granted, resulting in the striking of the IHO's orders for relief, it is not necessary to consider L.O.'s motion for summary judgment, contending that those orders make her a prevailing party, and

---

[17] The IHO found that the only medically-related service L.O. needed was access to the nurse's office to take her prescriptions, and that service was being provided. (A.R. at 659.)

her motion will be denied. To this the court will add one thing. The court is confident

that its decision concerning compensatory education is correct. That issue, based on

L.O.'s contention that she should have been provided services earlier, and related

questions such as whether the IEP was adequate and whether the School prejudged her

disability, were the main substance of her request for a due process hearing below, and

she has not obtained success on any of those issues. Even if the other issues, including

the order to address measurability of goals and objectives, were to be decided the other

way, L.O.'s success would be *de minimis*, and that would mean no award of attorney

fees. *Cf. Monticello School Dist. No. 25 v. George L.*, 102 F.3d 895, 908 (7th Cir. 1996); *see*

*Giosta*, 542 Fed. Appx. at 524-25.

### CONCLUSION

For the reasons above, plaintiff L.O.'s motion for summary judgment (DE #31) is

**DENIED**, and she shall take nothing by her complaint. Defendant School's motion

motion for summary judgment (DE #33) is **GRANTED**; amended conclusion of law #19

in the administrative decision below is struck, as are hearing decision orders 1 -7.

**SO ORDERED.**

Date: September 30, 2014


s/James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT